# THE STATE v. WALKER, Appellant.

### Division Two, May 22, 1906.

**MURDER: Self-Defense: Instruction: Evidence.** Where there is no evidence that the defendant sought and provoked a difficulty with deceased in order to wreak his vengeance on him, it is error for the trial court to frit away the defendant's right of self-defense and excuse the aggressor on such a ground. And in this case, which was a prosecution for murder, the evidence is examined and it is *held* that defendant was entitled to an unqualified instruction on self-defense.

Appeal from Ozark Circuit Court.—*Hon. Jno. T. Moore,* Judge.

REVERSED AND REMANDED.

*Seth Conrad* and *Livingston & Livingston* for appellant.

(1) There is no evidence, fact or circumstance in the whole case upon which a conviction can stand. The evidence, both for the State and for defendant, makes out a complete, absolute, perfect case of self-defense. (2) We challenge the State to find in this record one iota of evidence, any fact or circumstance, that would in the remotest degree authorize or justify the giving of the qualified instructions on self-defense. The giving of these instructions, whatever view the court may take of the case, is palpable and inexcusable error.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

The instructions were full and complete in every respect; they properly defined murder in the first and second degrees, reasonable doubt, the burden of proof,

the weight to be given to defendant's testimony, the credibility of the witnesses and self-defense. If any error was committed, said error was in favor of the defendant. State v. Hudspeth, 159 Mo. 196; State v. Inks, 135 Mo. 638; State v. McCarver, 194 Mo. 717.

GANTT, J.—At the August term, 1905, of the Ozark Circuit Court, the prosecuting attorney within and for said county filed an information charging the defendant Walker with murder, in the first degree, of one Guy T. Harrison, at the said county, on the 21st day of July, 1905. The defendant was arrested and duly arraigned, and at the same term was put upon his trial, and was convicted of murder in the second degree, and his punishment assessed at ten years in the state penitentiary. From the conviction and sentence he appeals to this court.

The evidence on behalf of the State tended to prove that the deceased, Guy T. Harrison, was a member of the bar, residing at Gainesville, Ozark county, and about thirty-eight years of age, and weighed about 180 pounds, strong and vigorous, and the defendant is about forty-five years of age, small in size, and had for many years been crippled and deformed as the result of rheumatism. Mr. Harrison, the deceased, owned a farm near the town of Gainesville, but resided in the town. The defendant lived on a farm adjoining this farm of the deceased. Dr. White testified that on the 21st of July, 1905, he examined the body of Guy T. Harrison, who was dead at the time; he found a gun-shot wound about two inches and a half below the collar bone, on the right side and just to the right of the breast bone. The bullet seemed to have entered something like two and a half inches below the collar bone on the right side of the breast bone and ranged backwards and somewhat downwards to the left. The ball went directly through the body and the deceased was shot from the front and the ball entered into his front. The shot was neces-

sarily fatal. He testified further, that on the day after the killing he saw the defendant, and found in the corner of his mouth on the upper lip a bruise, the lip was mashed, and when he raised the lip he could see that the membrane was cut; there was also a small cut under his right eye as if he had been struck on his cheek bone; it was still black under the eye, and he gave him a wash to treat the wound in his mouth.

D. D. Turnbaugh testified that he resided in Gainesville and was publisher of the Ozark County Times on the 21st of July, 1905. He was acquainted with Guy Harrison in his lifetime; he examined the place where Harrison was killed on that day; it was located in a little plum thicket about thirty-five or fifty feet from the public road. There was a little open place in this thicket some four or five feet square in which the body was lying; this place was some four or five feet above the body of the branch which runs near there. He testified that a man standing in that little open place could not see a man going along the road, nor could a man going along the road see anyone in that open space without stooping down and looking under the grove; he testified that he made investigations for bullet marks on the timber and found bullet abrasions on three limbs, and he took a position to get in line with these abrasions; to have made the abrasions, in his opinion, a man would have had to get down on his right knee and used the left as a rest. They were not on a level, the bullet that made the abrasions was rising a little.

Mr. R. Q. Gilliland testified that he went to the scene of the killing on the day it occurred and looked for a trace of a bullet, but did not find it, but on the next Tuesday following the killing they found the course of the bullet; it had hit two limbs on some plum bushes; they were slightly ascending; he was of the opinion that a man would have to be down on his knees to have fired the ball in the direction it took.

Fait Hayes testified that he was working for the

deceased on the day he was killed; he was on the farm of the deceased; he heard some four shots that morning within an hour and a half; no two of them were fired near each other; he was about a quarter of a mile from the place when the last shot was fired.    Asa Scott was with him; Scott was cutting and the witness was hauling timber; just before the fourth shot was fired he heard some talking down where the body of the deceased was afterwards found, but he could not distinguish the words; he was just getting on his wagon when he heard the last shot fired and when he had gone about 150 yards, he heard his name called; he met another man by the name of George Scott, and heard some one call him Fait; when he got down there, he found Mr. Walker and Glennie Harrison, the son of the deceased.    Addressing the defendant, he said, "What is the matter Lum?"    Defendant and Glennie were then about fifty yards from where they found the body.    He testified that he ran; going down to this place he heard hogs squealing and dogs barking and the shooting and someone calling him, and that was why he ran.    When he asked the defendant what was the matter, the defendant said, "I have killed Guy."    He inquired of defendant, "Is he dead?" and he answered, "Yes, he is dead," and he said, "You go to town and take the news."    Witness then said to defendant, "Lum, this is a bad thing;" defendant said, "Yes, it is a bad thing, but he came on me with his gun. I want you to go in and see him, his gun is lying there by him cocked;" he went into the thicket and took Glennie with him, also the defendant with him; when he reached the body of the deceased, he said, "I do not see any gun," whereupon Glennie, the son of the deceased, said, "His gun is under him, he was lying on his face and I turned him over on his back."    And  Glennie then reached under his father's body and picked up the gun by the stock.    Witness said, "Glennie, is that your father's gun?" and he said, "Yes;" he then said, "Glennie, where were you?"

and he answered, "I was down there in the field." He further stated that when he said to the defendant, "It is a bad thing," the defendant said, "Yes it is a bad thing, but I had to do it, or get shot myself;" he said "that the deceased came on him with his gun." He testified that when Glennie took the pistol from under the body of his father, it was cocked, the hammer was clear back; he thought it was a self-acting pistol; he had the gun in his hand afterwards that day, it was still cocked; it was still lying there when he came back. Mr. Conkin, the sheriff, picked it up, he tried to let the hammer down, he put one thumb on the hammer and pulled on the trigger, but it would not go down, and finding that it was fast, reached it over to witness, but witness said to the sheriff, "Do not hand me that thing cocked in that way," and the sheriff took it back and laid it down. The sheriff tried to break it the first time and could not, but he took it back and let it down. On the Monday after the killing, witness had a conversation with the defendant, the defendant came down to where witness was working. In that conversation, the defendant said he was down there getting some hogs out of the field on the day of the killing and had trouble trying to get them out, and they ran into the thicket and he followed them in there; he broke his shoe string and set down to tie his shoe string, and while he was sitting there tying his shoe string, the deceased came up the road and stopped and looked up the road and then down the road and defendant spoke to the deceased and said, "Guy, what are you doing here?" and the deceased answered, "I am killing these d—— hogs, by G——." Defendant says, "Guy, don't you know it is wrong to butcher up a man's hogs that way?" whereupon deceased says, "No, I am going to kill every G—— d—— one of them, and you too," and then he said the deceased just came right up to him before he could get up to do anything at all; he never thought of having any trouble with him only to talk the matter

over, but Guy, the deceased, came right up on him and drew his gun, and he kind of stumped his toe as he came and stumbled towards him and punched defendant in the mouth with his gun, and he, defendant, discharged his gun about that time; when Guy came up to him, the defendant's gun was lying to the side of him and he said, when the gun was discharged, "Lord have mercy, I have let my gun go off." Witness testified that he had known the defendant six or seven years, and knew his physical condition; that defendant could not straighten out his fingers. He testified that defendant told him how he cocked his gun, he did it with the side of his hand; he said he was still down when Guy came on him with the gun; he called witness to his help, and said, "He came on me with his gun, and hurt my lip right there." He said, "He hit me there, or something like that." On cross-examination, the witness stated that he went to work that morning about seven o'clock, and Scott was working with him; they were engaged in building a new string of fence; he had been out working maybe three quarters of an hour when he heard the first shot, and then in perhaps three quarters of an hour after that he heard another shot, and the hogs squealing and the dogs barking, and he heard a third shot; it was something like an hour and a half from the third shot before he heard the fourth shot, and he heard loud talking just before this last shot was fired. The loud talking was continued up until this last shot was fired; he knew of no one else being in that field that morning outside of himself and Scott, except Glennie Harrison. When he left to go to town to take the news, he left Glennie Harrison, George Scott and the defendant down there, and when he came back with the sheriff, the pistol was lying just where it was when he left.

Glennie Harrison, the son of the deceased, testified that he was fifteen years of age; that on the morning of the killing he was riding horseback and had a dog with him to run the hogs out of the field; there was

corn growing in the field; he ran some of the hogs out through the water-gate, and he heard a shot fired on the north side of the road, and he came back and hitched his mare, climbed over the water-gate and found his dog lying there dead; after he found his dog was killed, he came to town and told his father. "I told him that somebody had killed my dog, he asked me if the hogs were in the field, and I told him that they were; that I was trying to drive them out and somebody shot my dog; the deceased then said, 'We will go down and get the d—— sons of b—— out, or get it rather,' so we started and went down by our house and father went into the house while I waited for him out in the road." He, Glennie, had no weapons; his father went into the house, and when he came back he had his pistol; we went on down to the field, and his father asked him how many hogs was in, and he told him; his father then said, "We will go down and get the d—— son of b—— out;" his father went on one side of the field and he went on the other. His father fired a shot at a hog and then went on down and fired another shot; he fired a third shot and killed a hog, and they picked it up and threw it over the water-gate; he then told his father that one hog went up southwest and they went up that way, but did not find anything but two pigs; the pigs turned into the brush and his father took up some rocks, put his pistol in his pocket and said, "We can kill these little ones with rocks," and he and his father turned and went into the brush about twenty feet apart, his father went in first; his father went into the brush after the hogs; he did not know that Mr. Walker, the defendant, was on the place; when he got down in the brush about thirty-five or forty feet, he heard the defendant speak to his father; he said, "Guy, what are you doing here?" and his father said, "I am killing these G—— d—— hogs." Defendant said, "Don't you know you are doing wrong?" and his

father said, "No, I am protecting my crop, I will kill every G—— d—— one of them;" then defendant said, "Are you going to pay me for the hogs you have killed?" and his father said "Not a G—— d—— cent," and then he said, "Don't," and the gun fired; only one shot was fired, he recognized the defendant's voice as the man who was talking to his father in the thicket; when he heard the gun fired, he turned and went to the point were his father started into the brush, and saw the defendant rising up from over his father; he stooped down and saw him; his father was lying on his face with his head towards the south. Walker, the defendant, then called for Bill Holt; when he called Holt, he, Glennie, answered him; defendant says, "Who is it?" and I said, "It is Glennie;" defendant said, "Glennie, I have shot your papa, come and shoot me." He then went in where his father was killed; he was not dead at that time; he called to him but he did not answer him at all; he picked up the pistol, it was lying right at the back of his father's head; he picked it up and the defendant said, "Don't; lay it down, it is cocked." He looked at the pistol and it was cocked, and he laid it down, and he turned his father over on his back; he was dying then; in turning him over he turned him over on the pistol. The defendant said to Glennie at that time, "He tried to shoot me, he hurt me on the mouth with his pistol;" he called attention to his lip being swollen and he then said, "We had better call for the boys." They then went out and called, and Hays answered. Hays came down, and the defendant told Hays to go to town and take the news. This constituted the State's case in chief.

The defendant testified in his own behalf that he was forty-five years old; that he had been afflicted for the last seventeen years with rheumatism, and for the last five years had been almost helpless; his shoulders were drawn and his hands were drawn out of shape; for two or three days before the killing, he had been

in Gainesville sitting up with a sick man, Mr. Cope. The evening before the difficulty, he went home; on the morning of the difficulty, he went down into the deceased's field to see to his hogs, he had heard they were in Mr. Harrison's field. He went down into the field and looked for one of them, said to have been killed the day before, but did not find it; then he went around the edge of the corn field and found his hogs there at the edge of the branch like, and started up the branch to get them out at the water-gate, but when he got there the water-gate had been fixed and he could not get them out; he saw some blood on the planks there and looked over the fence and saw one of his hogs dead; he then thought he would drive his hogs to the upper end of the field where there was a rail fence and lay the fence down and get them out, and when he got nearly up there some of them turned back to the road that runs east and west; he kept them on the north side of the road and got ahead of them where the two roads come together, and some of them started up towards this field south of the hollow and he got ahead of them there and drove them back up by the side of the thicket and they turned in there and he followed them into the thicket, and when he got in there a little ways he sat down to tie his shoe; before he got his shoe tied he heard some one hollow, ''Whoopee, sic;'' that was the first he knew that anybody was in the field; he was still sitting there tying his shoe, and in about a half a minute he saw Mr. Harrison come up right north of him; he stopped and looked at the defendant. Defendant asked him what he was doing there. He said, '' I am killing hogs;'' there was something said about driving them and defendant said to him, ''Don't you know it is wrong to kill hogs that way?'' and Harrison said, ''No, G—— d—— it, I don't.'' Defendant told him he did not know his hogs were getting in his field until yesterday, when Harrison said, ''You are a G—— d—— liar,

you turned them in." Whereupon, defendant said, "Guy, I do not want you to kill any more of my hogs." The deceased then walked right towards defendant and said, "I will kill every G—— d—— one of them, and you too," and drew his pistol; that was the first that the defendant knew that the deceased had a pistol; when he said that, he was six or seven steps distant, and the defendant grabbed for his gun with his left hand; his gun was on the right side of him and he started to get up just as he grabbed for his gun and got it in his left hand; deceased came running up to him and punched him in the face and struck him on the right side of the upper lip; the defendant tried to get up, but did not have the strength in his legs, and about the time he punched him in the face he heard the shot of the gun; the deceased was right over him. When the deceased punched the defendant in the mouth and knocked him back, defendant grabbed his gun as quick as he could and pushed on the hammer and had the gun between him and the deceased; he did not know whether it was his gun or the deceased's gun that fired; the deceased sprang on top of him, and when he fired the deceased fell on him, and it was some moments before he got out from under him. When deceased fell he dropped his gun, and as quick as he could get from under him he hollooed for Bill Holt. Asked if any one said, "Don't," during that difficulty, he answered that he did it himself. He was asked if he could get up off of the ground without getting up on his knees first, and he answered that he could not. He demonstrated to the jury that he cocked his gun with the side of his hand, because he did not have strength enough in his thumb to pull the hammer back. The first person he saw after the shooting was Glennie Harrison, and he told him to come in there. He testified that he never had Mr. Harrison's pistol in his hands at any time. He did not see it after he got up until Glennie came in and turned him over. He called for Bill Holt be-

cause he thought he was there in the field. On cross-examination he testified he could not stand up and shoot unless he had a rest or his knees against a tree or something that way. ''Q. You took this gun that morning to shoot crows? A. I was going to see to my hogs and then going to kill crows. Q. The gun is what you call a Stevens rifle? Ans. It is a single gun.'' He thought he took six or seven cartridges, he generally carried them in his right pocket. After he fired his gun he loaded it again; he could not say why he did load it. He had first learned the day before that his hogs had been down in Harrison's field, and that they were dogging his hogs, or rather that Glennie Harrison was dogging his hogs; he did not like it, his feelings were hurt; he went down to get the hogs out of Harrison's field that morning. He testified that he did not kill Harrison's dog; he heard two shots that morning when he was down looking for his hogs; he testified that he never thought of Harrison being down there, he thought the Scott boys were doing the shooting. When he drove the hogs down to the water-gate he did not know that it had been fixed, and then he attempted to drive them up to the rail fence and let it down, and the pigs turned into a thicket; he followed them in there. Witness then detailed circumstances of the killing as already stated. He testified that he shot the deceased to protect his own life and because he thought the deceased intended to kill him.

Mr. Conkin, the sheriff of the county, testified in behalf of the defendant that when he reached the place where the homicide occurred he found the defendant Walker, Glennie Harrison, George and Asa Scott there; the body of Mr. Harrison was lying on its back; the pistol was lying there beside him; he requested Hays to pick up the pistol, but the latter declined to do so, and the witness picked it up himself; he found that the hammer was hung, it would not work, the pistol was cocked; he testified that he noticed where the

bullet had gone through the brush or limbs, that the bullet ranged up and cut three twigs; he testified that if a man had been standing up and shot a pistol from the point where he found the body, it could have never made the abrasions on the limb; that the party who shot the bullet that cut the twigs must have been sitting down. He testified that he had known Guy Harrison, the deceased, for many years, and that they were friends; he knew his reputation as a quarrelsome, turbulent, overbearing man; it was bad.

William Luna testified that he was probate judge of Ozark county, and had been sheriff; he was well acquainted with Mr. Harrison in his lifetime. He testified that he undressed the body of Mr. Harrison after his death; he found powder stains on the shirt when he took it off of him; he also testified that the range of the bullet that cut the twigs was upward. He testified that the reputation of Mr. Harrison as a quarrelsome, turbulent man was bad.

Mr. J. S. Miller also testified that he was the constable of the township and had known Mr. Harrison all his life and that his reputation as a quarrelsome, turbulent, overbearing man was bad.

Tesley Luna testified that he was acquainted with Mr. Harrison; that sometime in the preceding summer he had a conversation with Mr. Harrison, the deceased, about Walker, the defendant; that deceased said that he ought to or had a notion to get him a shot gun and go down there, it was something about hogs in the field, some of Walker's hogs, and that he had a good notion to get him a shot gun and go down and kill him, that is about what he stated. This is the substance of all the testimony in the case.

1. We have given a full statement of all the material evidence for the reason that the propriety of the instructions can only be ascertained by a knowledge of the testimony.

That the evidence demanded an instruction on self-

defense is apparent from the most cursory reading. Indeed, the most serious question on this appeal is whether the circuit court should not have directed an acquittal, but there can be no two opinions that the defendant was entitled to a clear instruction on the law of self-defense without the qualifications injected into the instruction, which we have numbered four for the purpose of this opinion. There was not a scintilla of evidence tending to prove that the defendant sought, brought on or provoked the difficulty in which he shot and killed the deceased; neither was he doing any unlawful act when he went upon his neighbor's lands merely to drive his hogs therefrom and prevent the destruction of the crops of his neighbor and the hogs. The only circumstance that by any sort of deduction could be tortured into a seeking of the difficulty was the fact that defendant at the time the difficulty arose was in the plum thicket with a gun, on the farm of deceased; but when it is considered that he had gone there in following his hogs to get them out of the field and the fact that the place was entirely removed from any usual traveled route of the deceased, the utter improbability of his meeting the deceased at this place is at once apparent. He had no cause to apprehend that the deceased, a practicing lawyer, would at that time of the day be in this field pursuing the hogs, or that he would come into the thicket, as there was no path through it. The law is that one may not deliberately seek and provoke a difficulty with another with a design to kill him and then invoke the right of self-defense, but it is also the law that where there is no evidence of such seeking and provoking a difficulty in order to get an opportunity to wreak one's vengeance on another, it is error for the trial court to frit away the right of self-defense by inviting the jury to enter the field of conjecture and excuse the aggressor on such a ground when there is, as in this case, no basis for such a qualification of the law of self-defense. This instruction likewise argu-

State v. Walker.

mentatively destroyed all the effect of the threats made by deceased against defendant and the proof of his violent, quarrelsome and overbearing disposition. It would have been preferable not to have mentioned either of these, because, as stated, they were practically excused by the court. But the crowning error in this instruction is found in that clause which told the jury "that even though they believe the deceased, Harrison, did advance on the defendant with a drawn pistol and with the intent to take the life of defendant or do him great bodily harm, yet if they believe from the evidence that defendant was on the premises of deceased with intent to bring on or provoke a difficulty with deceased for the purpose of taking the life of deceased or with the fixed felonious intent of voluntarily entering into a difficulty with deceased to take his life, there was no self-defense in the case, even though they believed from the evidence that the deceased did advance on the defendant and drew his revolver and attempted to take the life of the defendant." The evidence that defendant was on the premises of the deceased, in the circumstances of this case, had no criminal significance. Deceased at no time requested defendant to leave his premises nor was his presence there in any sense a cause of the assault made upon him. Certainly, it afforded no ground for deceased drawing his revolver and attempting the life of the defendant without any provocation. We can conceive of no more hurtful instruction than this one was and one with less basis. There was nothing in the remarks of defendant to deceased, accepting his son's version of what occurred, that justified the deadly assault made by deceased upon defendant. On this point the testimony of defendant was corroborated in all material points by that of the son of deceased, and by the physical facts which appeared to the other disinterested witnesses when they appeared on the scene of the homicide. The proximity of the combat-

ants, the loaded pistol, the wounds upon the mouth and face of the defendant, the range of the bullet, and the crippled condition of defendant from rheumatism, all indicate that the deceased was the aggressor, and but for the condition of the revolver, the result probably would have been that the defendant would have been the victim instead of deceased. For the errors in this instruction the judgment must be reversed and the cause remanded. As the case must go back for a new trial it is proper to add that, upon the facts disclosed, the court should have instructed on manslaughter in the fourth degree. We are impressed from a careful reading of the whole record that the defendant did not have a fair and impartial trial and that the instructions of the court produced a verdict which the law and the testimony did not justify. The judgment is reversed and the cause remanded for a new trial in accordance with the views herein expressed.

*Burgess, P. J.*, and *Fox, J.*, concur.